J-S22004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.S.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 120 MDA 2020 |

Appeal from the Decree Entered December 26, 2019
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2019-4423

BEFORE:   OLSON, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 26, 2020**

Appellant, R.S., ("Mother") appeals from the December 26, 2019 final order and decree involuntarily terminating Mother's parental rights to her dependent child, E.S.J., a male child born in June 2015, pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]  Justin P. Miller, Esq. ("Attorney Miller") filed an ***Anders*** brief[2] and a petition to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] On December 26, 2019, the trial court involuntarily terminated the parental rights of E.S.J.'s biological father, A.D.J., ("Father") in a separate final order and decree.  Trial Court Final Order and Decree, 12/26/19.  Father did not appeal the termination of his parental rights and he is not a party to this appeal.

[2] ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***Commonwealth v. McClendon***, 434 A.2d 1185 (Pa. 1981).

withdraw, alleging that the appeal is frivolous. We grant counsel's petition to withdraw and affirm the final order and decree.

The trial court set forth the following:

[Centre County Children and Youth Services ("CYS")] first became involved with Mother and E.S.J. in February [] 2018. At that time, [CYS] received a referral that Mother [] left E.S.J., then two years old, alone in her [vehicle] while she [delivered] food for her employer, Grubhub. When [a CYS] caseworker initially contacted Mother, she admitted to [leaving E.S.J.] alone in the [vehicle], and the caseworker had an extensive discussion with her about the dangers involved in leaving a young child unattended in a vehicle. The caseworker also talked with Mother about how to navigate her delivery work while having [E.S.J.] with her. Mother agreed she would take [E.S.J.] into the homes with her when she made deliveries. During the intake assessment for this initial referral, [CYS] learned that Mother [] moved to Centre County[, Pennsylvania] from the Philadelphia[, Pennsylvania] area because she wished to be closer to her three other children who lived in Centre County with their paternal grandfather [("Paternal Grandfather")] and also because she wished to separate herself from domestic violence that [occurred] in the context of her relationship with Father.

CYS received a second referral in September [] 2018, when it was reported that Mother was driving [with] E.S.J. in her vehicle without [restraining] him in a child safety seat. While Mother was driving, E.S.J. [was] observed bouncing around in the back and front seats of the [vehicle], and with his head sticking out of the car window. After repeated attempts, CYS made contact with Mother, who was on her way to pay a fine related to failing to use a child safety seat. [CYS caseworker], Nichole Williams, ensured Mother had an appropriate car seat. Although Mother had a car seat, she did not use it because it was hard for her to keep E.S.J. in the seat. Ms. Williams gave Mother information about service providers that might be able to give her a new car seat, as well as educational materials regarding the importance of using appropriate child safety restraints and not having children in the front seat of moving vehicles. During this encounter, Ms. Williams talked at length with Mother about the need to have E.S.J. in a car seat. Mother admitted that she [drove] without [restraining E.S.J.] in a car seat. Ms. Williams testified that Mother did not

appear to appreciate why her conduct was inappropriate.[3]  Ms. Williams explained to Mother the dangers to E.S.J. of being unrestrained and being in the front seat of her [vehicle].  Mother was provided examples of things that could occur and the resulting harm that E.S.J. could suffer.  Mother still did not appreciate the danger, stating that she was a safe driver[,] and she did not think anything would happen to E.S.J. while she was driving.  Ms. Williams also talked with Mother regarding the legal requirements in that regard.

Ms. Williams testified that Mother still did not seem to understand or appreciate the importance of safely restraining E.S.J. while he was in a moving vehicle.  She talked with Mother extensively about the dangers to E.S.J., and gave Mother examples of accident hazards that were beyond Mother's control, such as other vehicles stopping short in front of her or otherwise causing an accident, and wildlife running in [front] of her [vehicle] so she would have to stop short.  Ms. Williams spoke with Mother in concrete terms of the possibility that in such a circumstance, E.S.J. could be propelled into the windshield or even outside the [vehicle].  Mother was dismissive of the warnings.  Mother focused on what a good driver she was, and that she believed it was good for E.S.J. to ride [in the front seat] with her because it was such a long day for him when she was driving around for hours for her food delivery job.  Ms. Williams talked with Mother about ways she might alleviate the situation, such as [] taking breaks during the day and stopping at a park or to eat and getting out of the [vehicle].  Mother did not feel this was a viable option due to her work demands.  Ms. Williams also spoke with Mother about daycare options and spoke with her about partially subsidized providers and other resources.  Mother expressed at that time a desire that Father would come to the area and care for E.S.J. while she worked.  She did not follow through with any of the other resources.

---

[3] Section 4581(a)(1)(i) of the Pennsylvania Vehicle Code requires that a child under four years of age be securely fastened in a child passenger restraint system while in a moving vehicle.  75 Pa.C.S.A. § 4581(a)(1)(i) (stating, "any person who is operating a passenger car . . . and who transports a child under four years of age anywhere in the motor vehicle, including the cargo area, shall fasten such child securely in a child passenger restraint system").  The failure to securely fasten the child in a child passenger restraint system is a summary offense.  *Id.* at § 4581(b).

Approximately one month later, during a home visit, Father was present at Mother's home. He informed CYS that he planned to care for E.S.J. while Mother was working. [CYS] later learned that Father [left the area to reside in] Allentown, Pennsylvania.

CYS closed its open case file on November 6, 2018[,] because it [] believed that Mother understood that E.S.J. must not be left unattended and must be in a child safety restraint while in a moving vehicle, and believed that Mother would comply with these requirements.

On November 20, 2018, CYS received another referral. This time, the report was that Mother was inside a McDonald's [located along] Benner Pike in State College, Pennsylvania at approximately 1:00 a.m. and that E.S.J. was outside in the [vehicle], alone, in the parking lot. There were mixed reports regarding how long [E.S.J.] was left alone in the [vehicle]. Police reported that they responded to a call regarding the incident, and that it took them approximately 40 minutes before they could locate Mother. Mother, who acknowledged having left [E.S.J.] alone in the [vehicle] and out of her sight at 1:00 a.m., [claimed] she had only been inside [the McDonald's] for about 10 minutes while she used the bathroom and spoke to people inside.[4] Mother was charged by the police for leaving [E.S.J.] unattended in the vehicle; it was her fourth time receiving charges for leaving E.S.J. alone in her [vehicle] over the course of a year. She plead guilty. In talking with Mother about this incident, CYS again spoke extensively with her about the danger posed to E.S.J. by her behavior. Mother expressed that there was no risk to E.S.J. because there are security cameras in the McDonald's parking lot and State College is a low[-]crime area. She also noted that three-year–old E.S.J. had a cell phone he could use to call for help or to entertain himself.

As a result of the November 20, 2018 referral, [CYS] worked with Mother to develop a safety plan, as it was apparent that Mother did not appreciate the safety risks for E.S.J., or at least would not

---

[4] Section 3701.1 of the Pennsylvania Vehicle Code states that a person driving or in charge of a motor vehicle commits a summary offense if the person permits "a child under six years of age to remain unattended in the vehicle when the motor vehicle is out of the person's sight and under circumstances which endanger the health, safety or welfare of the child." *See* 75 Pa.C.S.A. §§ 3701.1(a) and (b).

follow instructions that he could not be left alone in a vehicle. [Paternal Grandfather] was identified by Mother as a family resource. [Paternal Grandfather] is the paternal grandfather of Mother's three other children, "E," who is close in age to E.S.J., "N1" (age 14) and "N2" (age 15). [Paternal Grandfather] has custody of all three children. In a meeting with CYS, [Paternal Grandfather] stated that he [] engaged in several conversations with Mother about not leaving E.S.J. unattended in a vehicle and about [enrolling] E.S.J. [] in [daycare]. It was ultimately agreed that a safety plan would be entered, pursuant to which E.S.J. would stay with [Paternal Grandfather], and Mother could visit with E.S.J. at [Paternal Grandfather's] home while E.S.J. was under [Paternal Grandfather's] supervision. E.S.J. has remained in [Paternal Grandfather's] home since November 20, 2018.

CYS also contacted Father on November 20, 2018. Father initially indicated he wanted to [] take custody of E.S.J. In doing routine background checks, [CYS] learned that Father had outstanding warrants relative to marijuana-related charges and outstanding fines. It also became apparent that Father had not consistently been a part of E.S.J.'s life, and there was a past history of domestic violence between Mother and Father.[FN1] Although Father initially agreed to the safety plan that had been established, he subsequently advised [CYS] he [] changed his mind, and that he wanted E.S.J. to come to live with him in the Philadelphia area.

> [FN1] Father reported that Mother was the aggressor in these incidents, and that he would only defend himself.

Due to [CYS's] concerns with both Mother and Father, [CYS] filed for a safety plan hearing, and ultimately filed a dependency petition with the [trial c]ourt. After a dependency adjudication hearing on December 27, 2018, E.S.J. was declared dependent and placed in the care and custody of [CYS]. E.S.J.'s placement remained with [Paternal Grandfather].

In addition to the dependency adjudication, testimony established that CYS filed indicated abuse reports against Mother related to [] leaving E.S.J. unattended in the [vehicle] on November 20, 2018. Mother appealed the indicated [abuse] reports, and [CYS] prevailed. According to the testimony, the status on those [indicated abuse] reports has been changed to "founded."

Testimony established that Mother was provided with extensive services over the course of her involvement with [CYS]. She was

- 5 -

offered parent[al] education through the Parenting Plus Program under [CYS's] guidance before E.S.J. was declared dependent[. She was also offered parental education through the same program] after the dependency adjudication but before commencement of formal, purchased, reunification services. The Parenting Plus Program had been recommended, in part, to help Mother understand the danger she was putting E.S.J. in by leaving him unattended in a vehicle, and by failing to ensure he was properly restrained in a car seat. Mother was also provided parent[al] education through Family Intervention Crisis Services ("FICS"), the agency contracted to provide formal reunification services for Mother and E.S.J.

At the commencement of reunification services in early February [] 2019, FICS established a service plan with specific goals for Mother.[FN2] Mother's primary goals were to: (1) address and maintain her mental health needs given concerns about past trauma and self-reported depression that was potentially impacting her ability to progress as a parent; (2) provide a stable and consistent lifestyle for E.S.J.; (3) demonstrate healthy parenting of E.S.J.; and (4) work with [CYS] on concurrent planning for E.S.J. in case he was ultimately not able to return [to Mother's] home. Testimony at the hearing clearly established that Mother failed to meet these goals, and in large part, failed to cooperate with [CYS].

> [FN2] Father, too, was engaged in reunification services, but requested that he and Mother proceed independently.

As to the mental health goal, the FICS reunification worker, Jessica DuFour, testified that there was no progress toward this goal [] despite significant efforts by FICS to assist Mother. FICS emphasized to Mother over the course of many sessions how meeting her own mental health needs was important for her and for her ability to progress in the reunification process with E.S.J. Mother initially wavered [] on whether she would attend counseling or treatment, and then outright refused any type of treatment at all, and refused to follow through with a recommended neuropsychological evaluation. Mother claimed problems with insurance but would not cooperate with FICS' efforts to assist her in overcoming this ostensible obstacle. Mother's reunification sessions were largely unproductive, and Mother cited them as a source of stress for her. FICS reduced sessions to every other week in an attempt to reduce Mother's

stress with the hope she would follow through with the mental health component of her goals. Mother never did so.

Mother also made no progress in terms of showing she could provide a stable consistent lifestyle for herself and E.S.J. FICS staff found it difficult to get Mother to focus during sessions. She often spoke over staff, and did not listen to feedback. Mother tended to blame others for E.S.J.'s placement [and refused] to acknowledge responsibility. FICS provided Mother with examples of how E.S.J. could have been harmed by her conduct, both real-life examples and hypotheticals. One example involved an actual incident when Mother's daughter, then two or three years old, had been hit by a [vehicle] when Mother should have been supervising her. Mother blamed others, including the [daughter], for this incident, rather than showing any appreciation of the vulnerability of small children and the need for adults to protect them. FICS workers had extensive discussions with Mother about the dangers involved in not using safety seats, but Mother did not show any appreciation for the danger she exposed E.S.J. [] in that regard. Notably, as of this time, Mother had received four traffic citations since E.S.J. was placed, two for failing to stop for stop signs and two for speeding. She was also involved in two traffic accidents in the year 2019; neither accident was her fault but they were severe enough that her vehicle was demolished each time. Even [after experiencing] these incidents, Mother refused to acknowledge she was endangering E.S.J. when she let him ride in the [vehicle] unrestrained.

Mother failed to cooperate with addressing home concerns in many aspects. Mother answered the door for approximately one-half of the attempted visits for life-style checks. Most [life-style] checks were done in the afternoon and it was apparent that Mother was just getting out of bed and was not yet fully awake. The home was cluttered, and there was old food lying around. Mother had been advised she should be living her life as she would with E.S.J. [] in the home, and that the life[-]style checks were to see whether the home environment was safe and appropriate. There was an ongoing issue with Mother refusing to use outlet covers to protect E.S.J. from electrical hazards; Mother had outlet covers but would not plug them into the outlets. Mother failed to cooperate with respect to providing complete information needed for FICS to verify her budget information, and Mother did not provide a budget as requested. There were also concerns raised about the stability of Mother's housing situation. FICS was

not able to reach Mother's landlord at any of the numbers provided by Mother, or to [] verify the identity of the landlord.

Mother's progress with respect to the goal of demonstrating healthy parenting of E.S.J. was virtually non-existent. Mother was initially offered visitation with E.S.J. every other week for two-hour visits. [CYS] was unable to increase the frequency of [the] visits because E.S.J. was in distress after [his] visits with Mother, and because Mother was failing to make any progress overall. As to the visits offered, Mother attended 58 [percent] of them over the course of FICS' involvement. There were also times that Mother would fail to show for scheduled visits, disappointing [E.S.J.]. [CYS] adapted the routine so that Mother was scheduled to arrive one-half hour early, and then E.S.J. would be brought to the visit. Mother was also often late to visits. When visits did occur, E.S.J. appeared to struggle and exhibited anxious behaviors. Beginning in July, approximately five months into the reunification process, Mother began taunting E.S.J. during visits, calling him a baby when he would show distress. She would threaten to end visits if E.S.J. did not do exactly what she asked of him. She was observed to parent from the couch during visits; she[,] at times[,] failed to appropriately supervise E.S.J. and would ignore FICS staff when they prompted her in this regard. After visits with Mother, E.S.J. would exhibit behaviors such as aggression toward teachers and violence toward peers at daycare, not listening, and difficulty sleeping at night.

FICS continued to consistently work with Mother regarding car seat safety and asked her to secure E.S.J. in his [car] seat after each visit. With limited exception, Mother was unable to properly secure E.S.J. in his [car] seat despite being repeatedly shown how to do so. FICS staff constantly spoke with Mother about the need for the car seat and attempted to assist her in learning the appropriate way to use the [car] seat. During one of the conversations, Mother stated she had tinted her car windows so no one would [] be able to see whether E.S.J. was in a car seat. Clearly, she continued in her refusal to acknowledge the danger associated with his issue.

As far as the concurrent planning goal, Mother [] provided [Parental Grandfather] as a resource at the time of the initial safety plan. However, Mother did not provide any additional names of potential resources or placement options for E.S.J.

Testimony established that E.S.J. is doing very well in his foster home with [Parental Grandfather] and his half-siblings. [Parental Grandfather] has known E.S.J. since his birth, and he [] assisted Mother in caring for E.S.J. since Mother [] relocated to central Pennsylvania. FICS and CYS workers [] observed a healthy bond and relationship between [Parental Grandfather] and E.S.J., and between E.S.J. and his half-siblings. E.S.J. looks to [Parental Grandfather] to meet his needs. He is healthy, developmentally on track, and appears to be very well[-]adjusted in his current placement. He attends daycare, and since visitation with both his parents has decreased, he has been doing well at the daycare. Both Ms. Williams and Ms. DuFour testified about their observations in terms of E.S.J.'s connection to Mother. Both caseworkers testified that [] they had not observed a parent-child attachment or bond between E.S.J. and Mother. Ms. Williams testified that E.S.J. did not appear to want to interact with Mother in a way that most children his age would do with a parent, such as [] cuddling, touching and seeking parental attention. Ms. DuFour described the relationship between E.S.J. and Mother as "disconnected," conflicted and distant. She testified that E.S.J. appeared to struggle to interact with Mother. Although Mother testified that she loves E.S.J., she did not present evidence of a healthy bond with her son.

Finally, no testimony was presented from E.S.J., who was only four years of age at the time of the hearing. E.S.J.'s attorney supported the petition, having visited with E.S.J. in the home of [Parental Grandfather].

Trial Court Opinion, 2/12/20, at 2-8.

Procedurally, CYS filed a petition, on September 18, 2019, to terminate Mother and Father's parental rights involuntarily pursuant to Sections 2511(a)(2) and 2511(a)(5), as well as Section 2511(b) of the Adoption Act. The trial court appointed the Centre County Public Defender's Office as guardian *ad litem* for E.S.J. The trial court conducted a hearing on the petition to terminate Mother and Father's parental rights on December 20, 2019, at which time Mother and Father appeared, each represented by separate

counsel, as well as counsel for E.S.J., the guardian *ad litem* for E.S.J., and counsel for CYS.[5]  On December 26, 2019, the trial court terminated Mother and Father's parental rights.  This appeal followed.[6]

Preliminarily, we must address Attorney Miller's petition to withdraw and accompanying ***Anders*** brief, both of which allege this appeal is frivolous.

"When counsel files an ***Anders*** brief, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw." ***In Interest of J.J.L.***, 150 A.3d 475, 479 (Pa. Super. 2016) (citations omitted) (noting, the ***Anders*** principles extend to appeals involving the termination of parental rights).  In order to withdraw pursuant to ***Anders***, "counsel must file a brief that meets the requirements established by our Supreme Court in ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009)." ***Commonwealth v. Harden***, 103 A.3d 107, 110 (Pa. Super. 2014) (parallel citation omitted).  Specifically, counsel's ***Anders*** brief must comply with the following requisites:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state

---

[5] In November 2019, the trial court appointed separate counsel to represent E.S.J.'s legal interests, and maintained the appointment of the guardian *ad litem* to represent E.S.J.'s best interests.  N.T., 12/20/19, 5-6.

[6] On January 15, 2020, Mother filed a concise statement of errors complained of on appeal with her notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court subsequently filed its Rule 1925(a) opinion on February 12, 2020.

counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***J.J.L.***, 150 A.3d at 480 (citation omitted).

Pursuant to ***Commonwealth v. Millisock***, 873 A.2d 748 (Pa. Super. 2005), and its progeny, "[c]ounsel also must provide a copy of the ***Anders*** brief to [his] client." ***Commonwealth v. Orellana***, 86 A.3d 877, 880 (Pa. Super. 2014) (internal quotation marks and citation omitted). The ***Anders*** brief must be accompanied by a letter that advises the client of the option to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the ***Anders*** brief." ***Id.*** "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." ***Commonwealth v. Goodwin***, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*) (citation and internal quotation marks omitted).

Instantly, Attorney Miller has satisfied the technical requirements of ***Anders*** and ***Santiago***. In his ***Anders*** brief, counsel has identified the pertinent factual and procedural history.[7] Counsel raises one claim that could

---

[7] Although counsel does not include citation to the record in the statement of the case, as required, we find that counsel cites to the record in the argument section of the ***Anders*** brief sufficiently to assure this Court that counsel

- 11 -

arguably support an appeal, but ultimately concludes that the appeal is wholly frivolous. Counsel also attached to his petition a letter to Mother that meets the notice requirements of **Millisock**.[8] Mother did not file a response to counsel's **Anders** brief or the petition to withdraw. Accordingly, we proceed to conduct an independent review of the record to determine whether this appeal is wholly frivolous.

In his **Anders** brief, counsel raises the following issue on Mother's behalf: "Whether the trial court committed an abuse of discretion or error of law when it concluded [CYS] established grounds for termination of parental rights under 23 Pa.C.S.A. [§§] 2511(a)(2) and (a)(5)?" **Anders** Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or

---

evaluated the case and reviewed the relevant facts that may support any non-frivolous issue. **See Commonwealth v. Woods**, 939 A.2d 896, 899 (Pa. Super. 2007) (stating, counsel's recitation of record facts with citation to places in the record where the facts appear, assures this Court that counsel reviewed the record and sufficiently evaluated the case to determine which facts are significant and whether there are any non-frivolous issues).

[8] Although the certificate of service accompanying the **Anders** brief does not state that a copy of the brief was sent to Mother, the **Millisock** letter attached to the petition to withdraw states that a copy of the **Anders** brief, as well as a copy of the petition to withdraw, were enclosed with the letter.

abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act that requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child. *See* 23 Pa.C.S.A §§ 2511(a) and (b).

Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

- 13 -

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***B.J.Z.***, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Z.P.***, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). This Court "may uphold a termination decision if any proper basis exists for the result reached." ***Id.***

Sections 2511(a)(2), (a)(5), and (b) provide, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of

the parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), and (b).

The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in *In re Geiger*, [] 331 A.2d 172 ([Pa.] 1975), where [our] Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998).

*Z.P.*, 994 A.2d at 1117. The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *Id.*, *citing* *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). Section 2511(a)(2) "does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for [the child's] physical or mental well-being." *Z.P.*,

994 A.2d at 1117, *quoting **In re E.A.P.***, 944 A.2d 79, 82 (Pa. Super. 2008).

"[W]hen a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." ***Z.P.***, 994 A.2d at 1118 (citation omitted).

> In order for termination pursuant to Section 2511(a)(5) to be proper, the following must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1273–1274 (Pa. Super. 2003).

***In re A.S.***, 11 A.3d 473, 482 (Pa. Super. 2010). "[U]nlike Section 2511(a)(2), Section 2511(a)(5) evaluates the likelihood that services provided to a parent will remedy the conditions [that] led to the child's removal." ***Id.*** (citation omitted).

Here, counsel raises the issue that the trial court erred in finding clear and convincing evidence to terminate Mother's parental rights involuntarily under Sections 2511(a)(2) and (a)(5), but ultimately determines this issue is frivolous after counsel's review of the record. ***Anders*** Brief at 13-21. Counsel contends the record establishes, with clear and convincing evidence, that Mother received extensive services, including parenting skills education and

mental health services, from CYS and FICS designed to help Mother achieve the goals necessary to permit her to retain her parental rights to E.S.J., but that Mother failed to meet any of the goals. *Id.*

In finding that CYS met its burden under Section 2511(a)(2) by clear and convincing evidence, the trial court explained,

> [CYS] presented clear and convincing evidence that Mother's repeated and continued abuse, neglect and refusal []caused E.S.J. to be without essential parental care, control or subsistence necessary for his physical and mental well-being, and further, that the conditions and causes of that abuse, neglect and refusal cannot or will not be remedied by Mother. Mother and E.S.J. first became involved with [CYS] due to reports of Mother leaving then two-year-old E.S.J. unattended in her [vehicle] while she made food deliveries, and reports of her permitting E.S.J. to have free range of the [vehicle] while she drove [the vehicle]. Despite extensive efforts by [CYS] to educate Mother about the dangers of this behavior, and the substantial risk of serious harm posed to E.S.J., Mother did not change her behaviors or ever [] commit to doing so. Although she [] acknowledge[d] that her conduct was illegal, and even considered abusive, she refused to acknowledge that any harm could come to E.S.J. because of her [negligence]. During the course of the year and approximately seven months since Mother's involvement with [CYS], she could not or would not [] learn to properly restrain E.S.J. in a car seat. It is noteworthy that E.S.J. [] spent a significant amount of time in the [vehicle] with Mother when she was making deliveries for work. Although Mother [] repeatedly [took] the position she is a safe driver and no harm would come to E.S.J. when he is in the [vehicle] with her, she has been in two vehicle accidents in [] 2019, and received four traffic citations. Two of those [citations] were for failing to stop at a stop sign. Mother indicated that her solution to the car seat issue is to get tinted windows so no one can see whether E.S.J. is in his [car] seat. The [trial c]ourt further notes that Mother was charged four times over the course of a year for leaving [E.S.J.] unattended in a vehicle.
>
> Furthermore, even after E.S.J. was declared dependent and formally removed from Mother's care and custody, Mother refused to cooperate with [CYS] in terms of following recommendations

- 17 -

that were aimed at assisting her in developing parenting skills. Mother refused to address her mental health issues, and refused to address safety issues [] in the home, such as uncovered outlets. The [trial c]ourt concluded that Mother's actions also showed a complete disregard for E.S.J.'s mental well-being. Mother only attended 58 [percent] of the visits offered, and at times failed to call in advance when she would not be able to come to a visit. As of the summer of 2019, after E.S.J. had been in placement for approximately seven months, Mother would taunt him at visits and call him a baby when he would show distress. She would threaten to end visits early, and did not properly supervise him. Mother was not responsive to caseworkers when they tried to prompt her during visits.

In addition to the above, Mother [] failed to make any progress in terms of demonstrating to [CYS] that she can provide a stable home life for E.S.J. Despite their best efforts, [CYS] workers have been unable to confirm the stability of Mother's housing and her finances because of Mother's failure to provide information to [CYS].

In sum, [CYS] presented clear and convincing evidence that, due to Mother's abuse, neglect and refusal, Mother []caused E.S.J. to be without essential parental care necessary for his physical and emotional well-being, and that Mother would not remedy the underlying conditions and causes.

Trial Court Opinion, 2/12/20, at 10-12.

The record demonstrates that Mother repeatedly left E.S.J. unsupervised in her vehicle while she delivered food for a food delivery service and that Mother failed to place E.S.J. in a required child car seat when riding in Mother's vehicle. N.T., 12/20/19, at 7-9, 113. Mother received several citations for driving while E.S.J. was not restrained properly in a car seat, as

- 18 -

well as driving in excess of the posted speed limit.[9] *Id.* at 9, 16. Mother permitted E.S.J. to move about the vehicle while it was in motion, and on at least one occasion permitted E.S.J. to stick his head out the car window while Mother drove. *Id.* at 9-12. Mother's explanation for letting E.S.J. ride with his head out of the car window was that it was a warm day and people let their dogs stick their heads out of car windows. *Id.* at 11. On another occasion, Mother was charged with leaving E.S.J. alone and unsupervised in the vehicle at 1:00 a.m. for approximately 40 minutes while Mother was in a McDonald's using the restroom and talking with patrons. *Id.* at 15-17. Mother explained that E.S.J., then three years old, had a cell phone to use, if needed. *Id.* at 16.

Three agencies[10] provided counseling and parenting skills education to Mother, specifically coaching Mother on the need to provide a safe environment for E.S.J. *Id.* at 114. In coaching sessions, Mother was informed that her conduct of driving with E.S.J. unrestrained in a car seat was illegal and placed E.S.J. in perilous danger of injury or even death if the vehicle and its passengers were involved in an accident. *Id.* at 8, 10-11, 58, 66. Despite all of the coaching, Mother did not appreciate the importance of retraining

___

[9] Mother was also involved in two accidents in which Mother's vehicle was damaged to the extent that it was no longer drivable and Mother needed a new vehicle. N.T., 12/20/19, at 57-58.

[10] Mother received counseling and parenting skills education from CYS, FICS, and Parenting Plus Program.

E.S.J. in a car seat while driving, or understand the precariousness of her actions. *Id.* at 10-11, 17, 23, 57, 113. Mother would often blame others, including E.S.J., for the inappropriate and illegal behavior, and Mother had little, if any, appreciation for the dangers of her actions or the harm to E.S.J. that could occur. *Id.* at 10-11, 17, 55-57. One CYS caseworker described Mother as, "[s]he really [could not] think ahead, as most parents do, to identify what could be risky[.]" *Id.* at 24. As part of a court ordered safety plan, E.S.J. was removed from Mother's parental care due to safety concerns and placed with Paternal Grandfather, where he remains after the trial court adjudicated him dependent. *Id.* at 21.

When asked if she understood what could happen to E.S.J. when he was not properly restrained in a car seat and allowed to move about the vehicle freely while she was driving, Mother noted that officers and bystanders could see E.S.J. moving around the vehicle if he was not properly restrained in the car seat. *Id.* at 120. Mother's proposed solution involved tinting her car windows so E.S.J. could not be observed unrestrained in his car seat and freely moving about the vehicle. *Id.* at 66. Mother recalled prior citations that she received for failing to restrain E.S.J. in a car seat and blamed these violations on E.S.J., stating, that "he knew how to unclip himself" from the car seat, that she was trying to give him some freedom with the arm straps, or that "he might have been uncomfortable." *Id.* at 120. Mother maintained, however, that E.S.J. always rode in a car seat, despite several citations indicating the contrary. *Id.*

When asked what foods Mother felt were appropriate for E.S.J.'s breakfast, Mother stated, "I [do not] feel any food is inappropriate [] at any time because you can eat IHOP [] at dinnertime." *Id.* at 125. On one occasion, when asked to bring breakfast for E.S.J. to a visitation session, Mother arrived with unpeeled shrimp and said that it was safe for E.S.J. to eat the unpeeled shrimp, including the shrimp tails. *Id.* at 65. At her scheduled visits with E.S.J., Mother did not engage with E.S.J. by getting down on the floor to play with him. *Id.* at 63. Mother explained that she did not get down on the floor with E.S.J. to play because the floor was sometimes cold and she was concerned the floor had not been sanitized and was dirty, although she voiced no similar concerns for E.S.J. playing on the floor. *Id.* at 126. The record further demonstrates that Mother failed to address and maintain her mental health needs, including undergoing neuropsychological testing recommended by CYS, to provide housing information, including her landlord's name and contact information, to document a budget that would provide for E.S.J.'s needs, and to maintain a safe home, including a clean environment free of harmful obstacles, such as uncovered electrical outlets. *Id.* at 52-54, 58-60, 64.

We concur with the trial court that there has "been a repeated and continued [incapacity, neglect,] or refusal on the part of [Mother] to provide for [E.S.J.'s] needs in a way that would provide him with essential parental care and control necessary for his physical and mental well-being." *Id.* at 148. Specifically, Mother continuously placed E.S.J. in dangerous situations

that could result in serious harm or even death by failing to restrain E.S.J. in a car seat, permitting E.S.J. to move about the vehicle freely while it was in motion, and leaving E.S.J. unsupervised in the vehicle. Mother failed to comprehend the seriousness of her actions or the need to provide essential care and control over E.S.J. and failed to remedy or change her actions despite extensive parenting skills coaching. Moreover, Mother failed to take corrective actions in her home to prevent injury to E.S.J., or provide suitable, age-appropriate meals that E.S.J. could consume without injury. Based upon a review of the record, we discern no abuse of discretion or error of law on the part of the trial court in involuntarily terminating Mother's parental rights to E.S.J. pursuant to Section 2511(a)(2).[11]

Consequently, we conclude the record supports Attorney Miller's assessment that Mother's appeal is wholly frivolous.[12] Moreover, our independent review of the entire record reveals no additional, non-frivolous

_____

[11] In light of our conclusion that the trial court did not abuse its discretion or commit an error of law in terminating Mother's parental rights pursuant to Section 2511(a)(2), Mother's issue as it pertains to Section 2511(a)(5) is moot. *See A.S.*, 11 A.3d at 483 (reiterating, "this Court need only agree with the trial court on one ground relative to Section 2511(a) in order to affirm the termination of parental rights" (citation omitted)). Nonetheless, we discern no abuse of discretion or error of law on the part of the trial court in terminating Mother's parental rights to E.S.J. pursuant to Section 2511(a)(5).

[12] Although Mother does not raise an issue with regard to Section 2511(b), we discern no abuse of discretion or error of law in the trial court's conclusion that termination of Mother's parental rights is in the best interests of E.S.J.

claims.  Therefore, we grant counsel's petition to withdraw and affirm the final order and decree involuntarily terminating Mother's parental rights to E.S.J.

Order affirmed.  Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/26/2020